IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SUSANNAH ROSE<br>151 Mallory Boulevard<br>New Bloomfield, PA 17068<br><br>Plaintiff,<br><br>v.<br><br>BWI OF PA, INC. *d/b/a* BRIDGEWATER WHOLESALERS, INC.<br>299 Mulberry Drive<br>Mechanicsburg, PA 17050<br><br>Defendant. | CIVIL ACTION<br><br>NO.: _____<br><br><br>**JURY TRIAL DEMANDED** |

## CIVIL ACTION COMPLAINT

Susannah Rose (*hereinafter* referred to as "Plaintiff," unless indicated otherwise) by and through her undersigned counsel, hereby avers as follows:

### INTRODUCTION

1. Plaintiff has initiated this action to redress violations by BWI of PA, Inc. *d/b/a* Bridgewater Wholesalers, Inc. (*hereinafter* referred to as "Defendant") of the Americans with Disabilities Act, as amended ("ADA" – 42 U.S.C. §§ 12101 *et. seq.*); Title VII of the Civil Rights Act of 1964 ("Title VII" – 42 U.S.C. §§ 2000(d) *et seq.*), Section 1981 of the Civil Rights Act of 1866 ("Section 1981" – 42 U.S.C. § 1981), and the Pennsylvania Human Relations Act ("PHRA").[1] As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

---

[1] Plaintiff's claims under the PHRA are referenced herein for notice purposes. She is required to wait 1 full year before initiating a lawsuit from date of dual-filing with the EEOC. Plaintiff must however file her lawsuit in advance of same because of the date of issuance of her federal right right-to-sue letter under the ADA and Title VII. Plaintiff's PHRA claims however will mirror identically her federal claims under the ADA and Title VII.

## JURISDICTION AND VENUE

2. This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal laws.

3. This Court may properly assert personal jurisdiction over Defendant because its contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny.

4. Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because Defendant is deemed to reside where it is subjected to personal jurisdiction, rendering Defendant a resident of the Middle District of Pennsylvania.

5. Plaintiff is proceeding herein (in part) under the ADA and Title VII after properly exhausting all administrative remedies with respect to such claims by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and by filing the instant lawsuit within ninety ("90") days of receiving a notice of dismissal and/or right to sue letter from the EEOC.

## PARTIES

6. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7. Plaintiff is an adult individual with an address as set forth in the caption.

8. BWI of PA, Inc. *d/b/a* Bridgewater Wholesalers, Inc. is a provider of fine millwork with multiple locations in the United States (including Pennsylvania). Plaintiff was hired through and worked at Defendant's 299 Mulberry Drive, Mechanicsburg, Pennsylvania facility.

9. At all times relevant herein, Defendant acted by and through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for the Defendant.

## FACTUAL BACKGROUND

10. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

11. Plaintiff is a black (African-American) female.

12. Plaintiff was employed by Defendant as a laborer, assisting with building the outside casing of doors, from in or about May of 2018 until her unlawful termination (as discussed *infra*) on or about October 11, 2018.

13. Plaintiff was primarily supervised by Mill Manager, Keith Dursham (Caucasian, *hereinafter* "Dursham") and generally supervised by Building Manager, Rick (Caucasian – last name unknown, *hereinafter* "Rick").

14. During her tenure with Defendant, Plaintiff was a hard-working employee who performed her job well.

### -Race Discrimination-

15. During Plaintiff's tenure with Defendant, nearly the entire workforce of Defendant was non-black.

16. Shortly after Plaintiff started working for Defendant and up until her termination on or about October 11, 2018, Defendant's non-black management and co-workers, including but

not limited to Dursham, subjected Plaintiff to racial discrimination and harassment. By way of example, but not intended to be an exhaustive list:

    a. Unlike Plaintiff's non-black co-workers, Defendant's non-black management treated Plaintiff in a rude and demeaning manner, and regularly talked down to her;

    b. Unlike Plaintiff's non-black co-workers, Defendant's non-black management selectively enforced policies against her;

    c. In or about June or July of 2018, a co-worker, John (Caucasian – last name unknown, *hereinafter* "John") walked up to Plaintiff and stated "I smell fried chicken and hair grease" – a clear derogatory racial reference;

    d. On a separate occasion, John snickered and asked Plaintiff if she wanted a watermelon-flavored candy. When Plaintiff declined, John replied "I thought all you people like watermelon" – in reference to Plaintiff being black; and

    e. Upon information and belief, members of Defendant's non-black management and employees exhibited a pattern of discriminatory behavior to black employees, routinely using racially derogatory language, i.e. "nigger," in the workplace.

17. As a result of the aforesaid discriminatory and disparate treatment that Plaintiff was being subjected to because of her race, Plaintiff initially complained to Rick.

18. In response to Plaintiff's aforesaid complaints of race discrimination and disparate treatment, Rick informed Plaintiff that he would take her concerns to Human Resources and schedule a Safety Meeting for the workplace to go over Defendant's zero-tolerance discrimination policy. However, despite the fact that there were three subsequent Safety Meetings over the next few months, Plaintiff's complaints were never addressed.

19. Rather than meaningfully investigate or take prompt remedial action regarding Plaintiff's concerns of racial discrimination, Defendant's non-black management and co-workers, including but not limited to Dursham, continued to subject Plaintiff to hostility and animosity through verbal reprimands and disparate treatment. For example, but not intended to be an exhaustive list:

   a. Defendant's non-black management, including but not limited to Dursham, increasingly criticized and scrutinized Plaintiff's work;

   b. Defendant's non-black management and co-workers, including but not limited to Dursham, increasingly talked down to Plaintiff;

   c. Defendant's non-black management began to give Plaintiff substantially more work than her non-black co-workers, requiring her to perform the work of multiple people, and then criticized and berated her if she was unable to perform the work fast enough. Plaintiff requested assistance on several occasions, but her requests were denied; and

   d. In or about August of 2018, as Plaintiff was heading to her car at the end of her shift, John and his girl-friend (Caucasian), who were sitting nearby in their car, began to play the soundtrack music from the movie American History X (a movie about white supremacy, depicting graphic violence against African-Americans).

20. As a result of the hostile work environment that Plaintiff was being subjected to, Plaintiff complained to Dursham and again to Rick that she was still experiencing discrimination and disparate treatment from Defendant's non-black management and employees because of her race.

21. In response to Plaintiff's aforesaid complaints of discrimination and disparate treatment, Dursham informed Plaintiff that he would handle it; however, Plaintiff was never informed of any discipline and, upon Plaintiff's information and belief, the non-black employees that harassed Plaintiff were not terminated for their discriminatory and harassing conduct.

22. Shortly after complaining of discrimination and disparate treatment to Dursham and Rick, Plaintiff was abruptly sent home on or about October 10, 2018 by Dursham, for allegedly tossing a door casing to the floor too roughly despite that fact that she had often tossed them to the floor when working so quickly and did not break anything or cause any damage on this occasion.

23. More specifically, Plaintiff was attempting to do the work of several people cutting and filling door frames, which exacerbated her health conditions (as discussed in more detail *infra*), and in response to Dursham berating her to move faster, Plaintiff tossed the wood more roughly than she had intended.

24. Immediately after Dursham hostilely informed Plaintiff that she needed to go home, Plaintiff complained to Human Resources Manager, Kristen Ebner (Caucasian – *hereinafter* "Ebner") about Defendant's management's discriminatory and harassing conduct.

25. In response to Plaintiff's complaints of discrimination and harassment (*see* Paragraph 24), Ebner informed Plaintiff that she "shouldn't worry," "your job is safe," and to just go home because Plaintiff's shift was almost over. Ebner further informed Plaintiff that she would talk to Dursham.

26. On or about October 11, 2018, Plaintiff arrived for her shift early and began to work. Shortly thereafter, a co-worker, Lisa (Caucasian – last name unknown, *hereinafter* "Lisa") was assigned to work with Plaintiff and began to scream, curse and berate her to work faster.

Plaintiff advised Lisa that she was waiting for more items to cut, but Lisa screamed "I don't give a f**k," and threw a large, expensive, commercial stapler in Plaintiff's direction.

27. As a result of Lisa's harassing and violent conduct toward her (*see* Paragraph 26), Plaintiff was shaken and crying and immediately left the Mill Department to express her concerns of discriminatory and harassing treatment to Ebner in HR.

28. On her way to Ebner's office, Plaintiff was approached by Manager, Alonzo (African-American – last name unknown, *hereinafter* "Alonzo"), who informed Plaintiff that Defendant's non-black management had advised him and other employers not to communicate with her, and told her to "be careful."

29. Thereafter, Plaintiff informed Ebner of Lisa's harassing and violent conduct, reiterated her concerns of discriminatory and harassing treatment by Defendant's non-black management and employees, expressed frustration that her concerns had not been addressed thus far, and advised Ebner that she would be seeking the assistance of an attorney.

30. Plaintiff also requested the remainder of the day off because of the harassing behavior she had been subjected to by Lisa and others, which Ebner granted; however, just a few hours later, Plaintiff was informed by Ebner that she was the one being terminated for previously tossing the piece of door casing to the floor.

31. Defendant's purported reason for terminating Plaintiff – tossing a piece of door casing to the floor – is completely pretextual because (1) Plaintiff consistently worked hard for Defendant and performed her job well; (2) Plaintiff did not have a disciplinary history while working for Defendant; (3) Plaintiff often tossed door casing pieces to the floor when building quickly, and did not cause any damage while doing so on October 10, 2018; (4) Plaintiff was permitted to continue working after tossing the door casing piece on a subsequent day (and after

7

being told her job was totally safe) until she expressed further discrimination-lawyer concerns; (5) Plaintiff made several complaints of racial discrimination that were not meaningfully investigated, resolved or resulting in any discipline or termination of employees; (6) Plaintiff was terminated in close proximity to more recent and adamant concerns of racial discrimination and disparate treatment; (7) Plaintiff was treated disparately in many ways on account of race; and (8) issues that should have resulted in discipline or termination of others were overlooked or not enforced unlike with Plaintiff (i.e., a Caucasian female who actually threw an expensive piece of equipment was not terminated).

32. Plaintiff believes and therefore avers that she was really subjected to a hostile work environment and terminated because of her race and/or in retaliation for her complaints of race discrimination.

### -Disability Discrimination-

33. Separately and apart from the race discrimination, harassment, and retaliation that Plaintiff was subjected to during her employment with Defendant (discussed *supra*), Plaintiff was also subjected to discrimination and retaliation based on her serious health conditions.

34. At all relevant times during Plaintiff's employment with Defendant, Plaintiff suffered from a large ganglion cyst on her right hand, which required hand surgery (in addition to other complications).

35. As a result of her aforesaid health conditions, Plaintiff experienced pain, swelling, nerve involvement, and limited hand mobility, which (at times) limited her ability to perform some daily life activities, including but not limited to pushing, pulling, and gripping (among other daily life activities).

36. Despite her aforesaid health conditions and limitations, Plaintiff was able to perform the duties of her job well with Defendant; however, Plaintiff did require some reasonable accommodations while employed with Defendant (as discussed *infra*).

37. Plaintiff apprised Defendant's management, including but not limited to Dursham and Ebner, of her aforesaid disabilities and need for medical accommodations on several occasions throughout and until the end of her employment with Defendant.

38. For example, Plaintiff apprised Defendant's management, including but not limited to Dursham and Ebner that she would require reasonable medical accommodations in the form of intermittent and block time off for doctors' appointments and hand surgery to remove the cyst in the near future.

39. In response to Plaintiff' request for reasonable accommodations in the form of intermittent and block time off to care for and treat her health conditions, Ebner provided Plaintiff with short term disability ("STD") paperwork for her future surgery.

40. After requesting reasonable accommodations in the form of intermittent and block time off, Defendant's management subjected Plaintiff to hostility and animosity by treating Plaintiff in a rude and demeaning manner and clearly exhibiting frustration with Plaintiff's need to take time off from work in order to attend doctor's appointments. By way of example, but not intended to be an exhaustive list:

   a. Defendant's management, including but not limited to Dursham, began to overly scrutinize Plaintiff and criticize her work; and

   b. Defendant's non-black management, including but not limited to Dursham, began to give Plaintiff substantially more work than her non-black co-workers, requiring her to perform the work of multiple people (including work that typically required

at least two people) without assistance, and then criticized and berated her if she was unable to perform the work fast enough.

41. The hostile work environment that Plaintiff was subjected to, particularly having to perform substantially more work than her non-black co-workers, including duties that typically required at least two people, exacerbated Plaintiff's health conditions, causing her severe swelling and pain. As a result, Plaintiff required additional medical treatment and intermittent time off for doctor's appointments.

42. In the weeks leading up to her termination, Plaintiff complained to Dursham on several occasions that having to perform substantially more work than her non-disabled co-workers was aggravating her health conditions and causing her pain.

43. In response to Plaintiff's aforesaid objections to and complaints of Defendant's management's discriminatory and disparate treatment (*see* Paragraph 42), Dursham berated Plaintiff, asking "well what do you want me to do, if you keep taking time off, you won't have a job left." Dursham further threatened to assess Plaintiff write-ups for any additional time that she took off from work to care for and treat her health conditions.

44. Plaintiff objected to the aforesaid discriminatory mistreatment that she was being subjected to and informed Ebner that she would be seeking the assistance of an attorney.

45. On or about October 11, 2018, shortly after her last complaints of discrimination and a hostile work environment to Defendant's non-black management, Plaintiff was abruptly terminated for pretextual reasons (as discussed *supra*).

46. Plaintiffs believes and therefore avers that she was really subjected to a hostile work environment and terminated by Defendant because of (1) her known and/or perceived disabilities,

(2) her record of impairment; (3) in expressing concerns of unfair treatment as a result of her disabilities; and/or (4) in retaliation for her requested accommodations.

## COUNT I
### Violation of Title VII of the Civil Rights Act of 1964 ("Title VII")
([1] Race Discrimination; [2] Retaliation; & [3] Hostile Work Environment)

47. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

48. During Plaintiff's employment with Defendant, she was subjected to discrimination and a hostile work environment through disparate treatment, pretextual admonishment, and demeaning and/derogatory comments and treatment because of her race and/or complaints of race discrimination.

49. Instead of investigating Plaintiff's aforesaid complaints of and/or objections to race discrimination, Defendant's management ignored them and left her legitimate concerns unresolved.

50. On or about October 11, 2018, shortly after her last complaints of race discrimination and a hostile work environment to Defendant's non-black management, Plaintiff was abruptly terminated for pretextual reasons.

51. Plaintiff believes and therefore avers that she was really terminated because of her race and/or her complaints about race discrimination.

52. These actions as aforesaid constitute violations of Title VII.

## COUNT II
### Violations of 42 U.S.C. Section 1981
([1] Race Discrimination; [2] Retaliation; and [3] Hostile Work Environment)

53. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

54. During Plaintiff's employment with Defendant, she was subjected to discrimination and a hostile work environment through disparate treatment, pretextual admonishment, and demeaning and/or derogatory treatment because of her race.

55. Instead of investigating Plaintiff's aforesaid complaints of and/or objections to race discrimination, Defendant's management ignored them and left her legitimate concerns unresolved.

56. On or about October 10, 2018, shortly after her last complaints of race discrimination and hostile work environment to Defendant's management, Plaintiff was abruptly terminated for pretextual reasons.

57. Plaintiff believes and therefore avers that she was really terminated because of her race and/or her complaints about race discrimination.

58. These actions as aforesaid constitute unlawful discrimination, retaliation and a hostile work environment under Section 1981.

## COUNT III
### Violations of the Americans with Disabilities Act, as Amended ("ADA")
([1] Actual/Perceived/Record of Disability Discrimination; [2] Retaliation; and [3] Hostile Work Environment)

59. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

60. Plaintiff suffered from qualifying health conditions under the ADA which affected her ability (at times) to perform some daily life activities including, but not limited to pushing, pulling, and gripping.

61. Plaintiff kept Defendant's management informed of her serious medical conditions and need for medical treatment and other accommodations.

62. Despite Plaintiff's aforementioned health conditions and limitations, she was still able to perform the duties of her job well with Defendant; however, Plaintiff did require reasonable medical accommodations at times.

63. Plaintiff requested reasonable accommodations from Defendant, including but not limited to intermittent and block time off for doctors' appointments, treatment, and future hand surgery.

64. Plaintiff was subjected to hostility and animosity due to her health and/or requests for accommodations through demeaning and/or discriminatory treatment towards her.

65. Plaintiff was terminated from Defendant in close proximity to informing Defendant's management that she needed intermittent and block time off for her health conditions.

66. Plaintiff believes and avers that she was terminated by Defendant due to (1) her known and/or perceived disabilities, (2) her record of impairment; (3) her requests for reasonable accommodations; and (4) her objections to the discriminatory treatment she was being subjected to as a result of her aforesaid health conditions and requests for accommodations.

67. These actions as aforesaid constitute violations of the ADA, as amended.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendant is to promulgate and adhere to a policy prohibiting discrimination and retaliation in the future against any employee(s);

B. Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement and seniority;

C. Plaintiff is to be awarded punitive damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

D. Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper and appropriate (including but not limited to damages for emotional distress, pain, suffering and humiliation); and

E. Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law.

Respectfully submitted,

KARPF, KARPF & CERUTTI, P.C.

By: _____
Ari R. Karpf, Esq.
3331 Street Rd.
Two Greenwood Square, Suite 128
Bensalem, PA 19020
(215) 639-0801

Dated: June 18, 2019